Ark. Towing Co. *v.* Colvin, Judge.

5-2618                                    355 S. W. 2d 287

Opinion delivered March 26, 1962.

*Henry W. Gregory, Jr., H. Murray Claycomb* and *Bridges, Young & Matthews,* for petitioners.

*Max M. Smith* and *George H. Holmes,* for respondent.

Jim Johnson, Associate Justice.  This is an original action seeking an order prohibiting the Circuit Court of Cleveland County from proceeding to try the case of Mrs. J. E. Langford, Administratrix of the Estate of J. E. Langford, deceased, v. C. J. Picton and the Arkansas Towing Company.

The complaint alleges that C. J. Picton, the Arkansas Towing Company, and Max Linthicum were doing business in Arkansas on June 26, 1959, and were jointly engaged in the construction of a loading dock on the Ouachita River at Moro Bay in Bradley County, Arkansas, and that J. E. Langford was killed when a fishing boat in which he was riding was overturned, allegedly because of the joint negligence of the defendants in operating a tugboat.

Picton and Linthicum are residents of the State of Texas and the Arkansas Towing Company is a Texas corporation.  Service of process was attempted on all three defendants under Arkansas Statute § 27-340.

All three of the defendants filed separate motions to quash which were heard by the Cleveland Circuit Court on September 1, 1961.  The Court granted the motion of Max Linthicum on the ground that at the time of the accident he was a bona fide resident of the State of

Arkansas and though thereafter he became a nonresident, he was not subject to the provisions of Arkansas Statute § 27-340. The Court overruled the motions to quash of Picton and the Arkansas Towing Company. From such order comes this Petition for Writ of Prohibition.

The evidence adduced at the special hearing on the motions revealed that the Arkansas Towing Company was formed in April of 1959 by C. J. Picton, Max Linthicum and E. B. Picton. It has never qualified to do business in Arkansas. The Towing Company entered into a contract with the Moro Gravel Company, an Arkansas corporation, on June 3, 1959. The first section of the contract is as follows:

"First party [Moro Gravel Company] does hereby grant unto second party [Arkansas Towing Company] the exclusive right and privilege to haul by water all sand and gravel excavated and shipped by water by First Party at Moro Bay, Arkansas, for a period of one year beginning on the 1st day of August, 1959, and terminating on the 1st day of August, 1960. Said sand and gravel shall be hauled by tug and barge to Monroe, Louisiana, a distance of approximately one hundred (100) miles and Second Party does hereby agree to haul sand and gravel said distance upon the following terms and conditions:"

The Towing Company leased several barges to fulfill this contract and made arrangements to use a tugboat owned by C. J. Picton and a tugboat owned by Max Linthicum. The barges and the two tugboats were taken to Moro Bay in June of 1959. The loading facilities, which under the contract were to be constructed by Moro Gravel Company, were not completed when the tugboats and barges arrived at Moro Bay.

One of the leased barges and the tugboat owned by C. J. Picton was used "roughly a period of ten days" in the completion of the construction of the loading facilities. The loading facilities extended from the land

out into the water "a piece". A pile driver had been placed on the barge and the tugboat was used to locate the barge at the proper place and to steady the barge in place while piling was being driven. It was while the loading facilities were being so constructed on June 26, 1959, that J. E. Langford drowned, allegedly as a result of the hazard caused by the backstream of the tugboat which was owned by Picton and being operated at the time by Max Linthicum. There was evidence to the effect that only a day or so before the drowning C. J. Picton had been captaining his own tugboat with his own crew which he paid from his own funds and performing the same duties in the construction of the loading facilities as were being performed by Max Linthicum at the time of the drowning.

Petitioners contend that they received no compensation for the use of the barge, tugboat and men during the construction operation, yet on cross-examination Max Linthicum testified as follows:

"Q. I understand, but let me ask you this, The whole operation and your part of it there was all through mutual agreement between you and Mr. Picton and the Arkansas Towing Company. Is that correct? Whether it was individually or a partnership or a joint enterprise. You were all jointly interested in it?

"A. We were interested. We certainly weren't out there sweating for free."

From all the evidence presented the trial court surely could have concluded that the work performed by petitioners in the construction of the loading facilities was for the mutual benefit of petitioners and Moro Gravel Company.

Petitioners further contended that they were not doing business or performing any character of work or service in Arkansas, and that they were in Arkansas for the sole purpose of engaging in interstate commerce, and loading facilities being constructed were an instrumentality of interstate commerce.

There was no evidence to the effect that the loading facilities were to be used solely for the loading of barges for shipment of sand and gravel in interstate commerce. There was evidence showing that petitioners had made a shipment to a place other than Monroe, Louisiana. Certainly the trial court could have found the facilities were such as could be used by the domestic corporation, Moro Bay Company, to service local or intrastate shipments. There was also evidence tending to show that petitioners maintained an office at Calion, Arkansas. Their business stationery listed a post office box in Calion. One of petitioners' witnesses on cross-examination testified to the effect that there was an office at Calion and that they had a telephone listing and advertisement, not only in Calion but in El Dorado and several other cities in that area of Arkansas. Surely this evidence raised the question of fact as to whether petitioners were holding themselves out to do business in the areas in which the evidence tended to show they advertised. There was further evidence from which the trial court could have concluded that the petitioners had not begun their operations under the contract: That they had not hauled a single shipment: They undertook to help the local producers construct its facilities which they were under no obligation to do under their contract to transport the products: That nothing had been transported in interstate commerce prior to the time the tort complained of was committed: That none of the acts of interstate commerce under the contract had occurred, and that there was no link in the chain of transportation involved in the work that was being done.

It follows, therefore, from what has been said above that jurisdiction of the court was determined by contested facts in which case we have repeatedly held that prohibition will not lie. See *Co-Ark. Construction Company* v. *Amsler, Judge,* 234 Ark. 200, 352 S. W. 2d 74; *Clement* v. *Williams, Chancellor,* 227 Ark. 199, 297 S. W. 2d 656; *Twin City Lines, Inc.,* v. *Cummings, Judge,* 212 Ark. 569, 206 S. W. 2d 438; *Murphy* v. *Trimble,*

200 Ark. 1173, 143 S. W. 2d 534; *Metropolitan Life Ins. Co.* v. *Jones,* 192 Ark. 1145, 97 S. W. 2d 64; *Stockburger* v. *Combs,* 190 Ark. 338, 78 S. W. 2d 816; *Merchants & Planters' Bank* v. *Hammock,* 178 Ark. 746, 12 S. W. 2d 421. See also Judge Leflar's ''The Law of Conflict of Laws'', Chap. 4, § 34, p. 56.

Writ of Prohibition denied.

HARRIS, C. J., and WARD, J., dissent.